# CITY OF LOS ANGELES *v.* ALAMEDA BOOKS, INC., ET AL.

No. 00–799.   Argued December 4, 2001—Decided May 13, 2002

*Michael L. Klekner* argued the cause for petitioner. With him on the briefs were *James K. Hahn, Rockard J. Delgadillo, Claudia McGee Henry, Anthony Saul Alperin,* and *Jeri Burge.*

*John H. Weston* argued the cause for respondent. With him on the briefs was *G. Randall Garrou.**

---

*Briefs of *amici curiae* urging reversal were filed for the State of Ohio et al. by *Betty D. Montgomery,* Attorney General of Ohio, *David M. Gormley,* State Solicitor, and *Elise W. Porter,* joined by the Attorneys General for their respective jurisdictions as follows: *Bill Pryor* of Ala-

JUSTICE O'CONNOR announced the judgment of the Court and delivered an opinion, in which THE CHIEF JUSTICE, JUSTICE SCALIA, and JUSTICE THOMAS join.

Los Angeles Municipal Code § 12.70(C) (1983), as amended, prohibits "the establishment or maintenance of more than one adult entertainment business in the same building, structure or portion thereof." Respondents, two adult establishments that each operated an adult bookstore and an adult video arcade in the same building, filed a suit under Rev. Stat. § 1979, 42 U. S. C. § 1983 (1994 ed., Supp. V), alleging that § 12.70(C) violates the First Amendment and seeking declaratory and injunctive relief. The District Court granted summary judgment to respondents, finding that the city of Los Angeles' prohibition was a content-based regulation of speech that failed strict scrutiny. The Court of Appeals for the Ninth Circuit affirmed, but on different grounds. It held that, even if § 12.70(C) were a content-neutral regulation, the city failed to demonstrate that the

bama, *Janet Napolitano* of Arizona, *Ken Salazar* of Colorado, *Richard Blumenthal* of Connecticut, *M. Jane Brady* of Delaware, *Robert A. Butterworth* of Florida, *Alan G. Lance* of Idaho, *Carla J. Stovall* of Kansas, *G. Steven Rowe* of Maine, *Thomas F. Reilly* of Massachusetts, *Mike Moore* of Mississippi, *Mike McGrath* of Montana, *Don Stenberg* of Nebraska, *Frankie Sue Del Papa* of Nevada, *Roy Cooper* of North Carolina, *Herbert D. Soll* of the Commonwealth of the Northern Mariana Islands, *Mike Fisher* of Pennsylvania, *Charles M. Condon* of South Carolina, *Mark Barnett* of South Dakota, *John Cornyn* of Texas, *Mark L. Shurtleff* of Utah, *Christine O. Gregoire* of Washington, *Darrell V. McGraw, Jr.,* of West Virginia, and *Gay Woodhouse* of Wyoming; for the American Planning Association et al. by *Scott D. Bergthold;* for the Capitol Resource Institute et al. by *Richard D. Ackerman* and *Gary G. Kreep;* for Morality in Media, Inc., by *Paul J. McGeady* and *Robin S. Whitehead;* and for the U. S. Conference of Mayors et al. by *Richard Ruda* and *James I. Crowley.*

Briefs of *amici curiae* urging affirmance were filed for the American Booksellers Foundation for Free Expression et al. by *Michael A. Bamberger;* for the DKT Liberty Project by *Julie M. Carpenter;* and for the First Amendment Lawyers Association by *Randall D. B. Tigue* and *Bradley J. Shafer.*

prohibition was designed to serve a substantial government interest. Specifically, the Court of Appeals found that the city failed to present evidence upon which it could reasonably rely to demonstrate a link between multiple-use adult establishments and negative secondary effects. Therefore, the Court of Appeals held the Los Angeles prohibition on such establishments invalid under *Renton* v. *Playtime Theatres, Inc.*, 475 U. S. 41 (1986), and its precedents interpreting that case. 222 F. 3d 719, 723–728 (2000). We reverse and remand. The city of Los Angeles may reasonably rely on a study it conducted some years before enacting the present version of § 12.70(C) to demonstrate that its ban on multiple-use adult establishments serves its interest in reducing crime.

I

In 1977, the city of Los Angeles conducted a comprehensive study of adult establishments and concluded that concentrations of adult businesses are associated with higher rates of prostitution, robbery, assaults, and thefts in surrounding communities. See App. 35–162 (Los Angeles Dept. of City Planning, Study of the Effects of the Concentration of Adult Entertainment Establishments in the City of Los Angeles (City Plan Case No. 26475, City Council File No. 74–4521–S.3, June 1977)). Accordingly, the city enacted an ordinance prohibiting the establishment, substantial enlargement, or transfer of ownership of an adult arcade, bookstore, cabaret, motel, theater, or massage parlor or a place for sexual encounters within 1,000 feet of another such enterprise or within 500 feet of any religious institution, school, or public park. See Los Angeles Municipal Code § 12.70(C) (1978).

There is evidence that the intent of the city council when enacting this prohibition was not only to disperse distinct adult establishments housed in separate buildings, but also to disperse distinct adult businesses operated under common ownership and housed in a single structure. See App. 29

(Los Angeles Dept. of City Planning, Amendment—Proposed Ordinance to Prohibit the Establishment of More than One Adult Entertainment Business at a Single Location (City Plan Case No. 26475, City Council File No. 82–0155, Jan. 13, 1983)). The ordinance the city enacted, however, directed that "[t]he distance between any two adult entertainment businesses shall be measured in a straight line . . . from the closest exterior structural wall of each business." Los Angeles Municipal Code § 12.70(D) (1978). Subsequent to enactment, the city realized that this method of calculating distances created a loophole permitting the concentration of multiple adult enterprises in a single structure.

Concerned that allowing an adult-oriented department store to replace a strip of adult establishments could defeat the goal of the original ordinance, the city council amended § 12.70(C) by adding a prohibition on "the establishment or maintenance of more than one adult entertainment business in the same building, structure or portion thereof." Los Angeles Municipal Code § 12.70(C) (1983). The amended ordinance defines an "Adult Entertainment Business" as an adult arcade, bookstore, cabaret, motel, theater, or massage parlor or a place for sexual encounters, and notes that each of these enterprises "shall constitute a separate adult entertainment business even if operated in conjunction with another adult entertainment business at the same establishment." § 12.70(B)(17). The ordinance uses the term "business" to refer to certain types of goods or services sold in adult establishments, rather than the establishment itself. Relevant for purposes of this case are also the ordinance's definitions of adult bookstores and arcades. An "Adult Bookstore" is an operation that "has as a substantial portion of its stock-in-trade and offers for sale" printed matter and videocassettes that emphasize the depiction of specified sexual activities. § 12.70(B)(2)(a). An adult arcade is an operation where, "for any form of consideration," five or fewer patrons together may view films or videocassettes

that emphasize the depiction of specified sexual activities. § 12.70(B)(1).

Respondents, Alameda Books, Inc., and Highland Books, Inc., are two adult establishments operating in Los Angeles. Neither is located within 1,000 feet of another adult establishment or 500 feet of any religious institution, public park, or school. Each establishment occupies less than 3,000 square feet. Both respondents rent and sell sexually oriented products, including videocassettes. Additionally, both provide booths where patrons can view videocassettes for a fee. Although respondents are located in different buildings, each operates its retail sales and rental operations in the same commercial space in which its video booths are located. There are no physical distinctions between the different operations within each establishment and each establishment has only one entrance. 222 F. 3d, at 721. Respondents concede they are openly operating in violation of § 12.70(C) of the city's code, as amended. Brief for Respondents 7; Brief for Petitioner 9.

After a city building inspector found in 1995 that Alameda Books, Inc., was operating both as an adult bookstore and an adult arcade in violation of the city's adult zoning regulations, respondents joined as plaintiffs and sued under 42 U. S. C. § 1983 for declaratory and injunctive relief to prevent enforcement of the ordinance. 222 F. 3d, at 721. At issue in this case is count I of the complaint, which alleges a facial violation of the First Amendment. Both the city and respondents filed cross-motions for summary judgment.

The District Court for the Central District of California initially denied both motions on the First Amendment issues in count I, concluding that there was "a genuine issue of fact whether the operation of a combination video rental and video viewing business leads to the harmful secondary effects associated with a concentration of separate businesses in a single urban area." App. 255. After respondents filed a motion for reconsideration, however, the District

Court found that Los Angeles' prohibition on multiple-use adult establishments was not a content-neutral regulation of speech. App. to Pet. for Cert. 51. It reasoned that neither the city's 1977 study nor a report cited in *Hart Book Stores* v. *Edmisten,* 612 F. 2d 821 (CA4 1979) (upholding a North Carolina statute that also banned multiple-use adult establishments), supported a reasonable belief that multiple-use adult establishments produced the secondary effects the city asserted as content-neutral justifications for its prohibition. App. to Pet. for Cert. 34–47. Therefore, the District Court proceeded to subject the Los Angeles ordinance to strict scrutiny. Because it felt that the city did not offer evidence to demonstrate that its prohibition is necessary to serve a compelling government interest, the District Court granted summary judgment for respondents and issued a permanent injunction enjoining the enforcement of the ordinance against respondents. *Id.,* at 51.

The Court of Appeals for the Ninth Circuit affirmed, although on different grounds. The Court of Appeals determined that it did not have to reach the District Court's decision that the Los Angeles ordinance was content based because, even if the ordinance were content neutral, the city failed to present evidence upon which it could reasonably rely to demonstrate that its regulation of multiple-use establishments is "designed to serve" the city's substantial interest in reducing crime. The challenged ordinance was therefore invalid under *Renton,* 475 U. S. 41. 222 F. 3d, at 723–724. We granted certiorari, 532 U. S. 902 (2001), to clarify the standard for determining whether an ordinance serves a substantial government interest under *Renton, supra.*

II

In *Renton* v. *Playtime Theatres, Inc., supra,* this Court considered the validity of a municipal ordinance that prohibited any adult movie theater from locating within 1,000 feet of any residential zone, family dwelling, church, park,

or school.   Our analysis of the ordinance proceeded in three steps.   First, we found that the ordinance did not ban adult theaters altogether, but merely required that they be distanced from certain sensitive locations.   The ordinance was properly analyzed, therefore, as a time, place, and manner regulation.   *Id.*, at 46.   We next considered whether the ordinance was content neutral or content based.   If the regulation were content based, it would be considered presumptively invalid and subject to strict scrutiny.   *Simon & Schuster, Inc.* v. *Members of N. Y. State Crime Victims Bd.*, 502 U. S. 105, 115, 118 (1991); *Arkansas Writers' Project, Inc.* v. *Ragland*, 481 U. S. 221, 230–231 (1987).   We held, however, that the Renton ordinance was aimed not at the content of the films shown at adult theaters, but rather at the secondary effects of such theaters on the surrounding community, namely, at crime rates, property values, and the quality of the city's neighborhoods.   Therefore, the ordinance was deemed content neutral.   *Renton, supra,* at 47–49.   Finally, given this finding, we stated that the ordinance would be upheld so long as the city of Renton showed that its ordinance was designed to serve a substantial government interest and that reasonable alternative avenues of communication remained available.   475 U. S., at 50.   We concluded that Renton had met this burden, and we upheld its ordinance.   *Id.*, at 51–54.

The Court of Appeals applied the same analysis to evaluate the Los Angeles ordinance challenged in this case. First, the Court of Appeals found that the Los Angeles ordinance was not a complete ban on adult entertainment establishments, but rather a sort of adult zoning regulation, which *Renton* considered a time, place, and manner regulation.   222 F. 3d, at 723.   The Court of Appeals turned to the second step of the *Renton* analysis, but did not draw any conclusions about whether the Los Angeles ordinance was content based.   It explained that, even if the Los Angeles ordinance were content neutral, the city had failed to demon-

strate, as required by the third step of the *Renton* analysis, that its prohibition on multiple-use adult establishments was designed to serve its substantial interest in reducing crime. The Court of Appeals noted that the primary evidence relied upon by Los Angeles to demonstrate a link between combination adult businesses and harmful secondary effects was the 1977 study conducted by the city's planning department. The Court of Appeals found, however, that the city could not rely on that study because it did not "'suppor[t] a reasonable belief that [the] combination [of] businesses . . . produced harmful secondary effects of the type asserted.'" 222 F. 3d, at 724. For similar reasons, the Court of Appeals also rejected the city's attempt to rely on a report on health conditions inside adult video arcades described in *Hart Book Stores, supra,* a case that upheld a North Carolina statute similar to the Los Angeles ordinance challenged in this case.

The central component of the 1977 study is a report on city crime patterns provided by the Los Angeles Police Department. That report indicated that, during the period from 1965 to 1975, certain crime rates grew much faster in Hollywood, which had the largest concentration of adult establishments in the city, than in the city of Los Angeles as a whole. For example, robberies increased 3 times faster and prostitution 15 times faster in Hollywood than citywide. App. 124–125.

The 1977 study also contains reports conducted directly by the staff of the Los Angeles Planning Department that examine the relationship between adult establishments and property values. These staff reports, however, are inconclusive. Not surprisingly, the parties focus their dispute before this Court on the report by the Los Angeles Police Department. Because we find that reducing crime is a substantial government interest and that the police department report's conclusions regarding crime patterns may reasonably be relied upon to overcome summary judgment against

the city, we also focus on the portion of the 1977 study drawn from the police department report.

The Court of Appeals found that the 1977 study did not reasonably support the inference that a concentration of adult operations within a single adult establishment produced greater levels of criminal activity because the study focused on the effect that a concentration of establishments—not a concentration of operations within a single establishment—had on crime rates. The Court of Appeals pointed out that the study treated combination adult bookstore/arcades as single establishments and did not study the effect of any separate-standing adult bookstore or arcade. 222 F. 3d, at 724.

The Court of Appeals misunderstood the implications of the 1977 study. While the study reveals that areas with high concentrations of adult establishments are associated with high crime rates, areas with high concentrations of adult establishments are also areas with high concentrations of adult operations, albeit each in separate establishments. It was therefore consistent with the findings of the 1977 study, and thus reasonable, for Los Angeles to suppose that a concentration of adult establishments is correlated with high crime rates because a concentration of operations in one locale draws, for example, a greater concentration of adult consumers to the neighborhood, and a high density of such consumers either attracts or generates criminal activity. The assumption behind this theory is that having a number of adult operations in one single adult establishment draws the same dense foot traffic as having a number of distinct adult establishments in close proximity, much as minimalls and department stores similarly attract the crowds of consumers. Brief for Petitioner 28. Under this view, it is rational for the city to infer that reducing the concentration of adult operations in a neighborhood, whether within separate establishments or in one large establishment, will reduce crime rates.

Neither the Court of Appeals, nor respondents, nor the dissent provides any reason to question the city's theory. In particular, they do not offer a competing theory, let alone data, that explains why the elevated crime rates in neighborhoods with a concentration of adult establishments can be attributed entirely to the presence of permanent walls between, and separate entrances to, each individual adult operation. While the city certainly bears the burden of providing evidence that supports a link between concentrations of adult operations and asserted secondary effects, it does not bear the burden of providing evidence that rules out every theory for the link between concentrations of adult establishments that is inconsistent with its own.

The error that the Court of Appeals made is that it required the city to prove that its theory about a concentration of adult operations attracting crowds of customers, much like a minimall or department store does, is a necessary consequence of the 1977 study. For example, the Court of Appeals refused to allow the city to draw the inference that "the expansion of an adult bookstore to include an adult arcade would increase" business activity and "produce the harmful secondary effects identified in the Study." 222 F. 3d, at 726. It reasoned that such an inference would justify limits on the inventory of an adult bookstore, not a ban on the combination of an adult bookstore and an adult arcade. The Court of Appeals simply replaced the city's theory—that having many different operations in close proximity attracts crowds—with its own—that the size of an operation attracts crowds. If the Court of Appeals' theory is correct, then inventory limits make more sense. If the city's theory is correct, then a prohibition on the combination of businesses makes more sense. Both theories are consistent with the data in the 1977 study. The Court of Appeals' analysis, however, implicitly requires the city to prove that its theory is the only one that can plausibly explain the data

because only in this manner can the city refute the Court of Appeals' logic.

Respondents make the same logical error as the Court of Appeals when they suggest that the city's prohibition on multiuse establishments will raise crime rates in certain neighborhoods because it will force certain adult businesses to relocate to areas without any other adult businesses. Respondents' claim assumes that the 1977 study proves that all adult businesses, whether or not they are located near other adult businesses, generate crime. This is a plausible reading of the results from the 1977 study, but respondents do not demonstrate that it is a compelled reading. Nor do they provide evidence that refutes the city's interpretation of the study, under which the city's prohibition should on balance reduce crime. If this Court were nevertheless to accept respondents' speculation, it would effectively require that the city provide evidence that not only supports the claim that its ordinance serves an important government interest, but also does not provide support for any other approach to serve that interest.

In *Renton*, we specifically refused to set such a high bar for municipalities that want to address merely the secondary effects of protected speech. We held that a municipality may rely on any evidence that is "reasonably believed to be relevant" for demonstrating a connection between speech and a substantial, independent government interest. 475 U. S., at 51–52; see also, *e. g., Barnes* v. *Glen Theatre, Inc.*, 501 U. S. 560, 584 (1991) (SOUTER, J., concurring in judgment) (permitting municipality to use evidence that adult theaters are correlated with harmful secondary effects to support its claim that nude dancing is likely to produce the same effects). This is not to say that a municipality can get away with shoddy data or reasoning. The municipality's evidence must fairly support the municipality's rationale for its ordinance. If plaintiffs fail to cast direct doubt on this rationale, either by demonstrating that the munici-

pality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings, the municipality meets the standard set forth in *Renton*. If plaintiffs succeed in casting doubt on a municipality's rationale in either manner, the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance. See, *e. g., Erie* v. *Pap's A. M.*, 529 U. S. 277, 298 (2000) (plurality opinion). This case is at a very early stage in this process. It arrives on a summary judgment motion by respondents defended only by complaints that the 1977 study fails to prove that the city's justification for its ordinance is necessarily correct. Therefore, we conclude that the city, at this stage of the litigation, has complied with the evidentiary requirement in *Renton*.

JUSTICE SOUTER faults the city for relying on the 1977 study not because the study fails to support the city's theory that adult department stores, like adult minimalls, attract customers and thus crime, but because the city does not demonstrate that freestanding single-use adult establishments reduce crime. See *post*, at 460–462 (dissenting opinion). In effect, JUSTICE SOUTER asks the city to demonstrate, not merely by appeal to common sense, but also with empirical data, that its ordinance will successfully lower crime. Our cases have never required that municipalities make such a showing, certainly not without actual and convincing evidence from plaintiffs to the contrary. See, *e. g., Barnes, supra*, at 583–584 (SOUTER, J., concurring in judgment). Such a requirement would go too far in undermining our settled position that municipalities must be given a "'reasonable opportunity to experiment with solutions'" to address the secondary effects of protected speech. *Renton, supra*, at 52 (quoting *Young* v. *American Mini Theatres, Inc.*, 427 U. S. 50, 71 (1976) (plurality opinion)). A municipality considering an innovative solution may not have data that could demonstrate the efficacy of its proposal because

the solution would, by definition, not have been implemented previously. The city's ordinance banning multiple-use adult establishments is such a solution. Respondents contend that there are no adult video arcades in Los Angeles County that operate independently of adult bookstores. See Brief for Respondents 41. But without such arcades, the city does not have a treatment group to compare with the control group of multiple-use adult establishments, and without such a comparison JUSTICE SOUTER would strike down the city's ordinance. This leaves the city with no means to address the secondary effects with which it is concerned.

Our deference to the evidence presented by the city of Los Angeles is the product of a careful balance between competing interests. On the one hand, we have an "obligation to exercise independent judgment when First Amendment rights are implicated." *Turner Broadcasting System, Inc.* v. *FCC*, 512 U. S. 622, 666 (1994) (plurality opinion); see also *Landmark Communications, Inc.* v. *Virginia*, 435 U. S. 829, 843–844 (1978). On the other hand, we must acknowledge that the Los Angeles City Council is in a better position than the Judiciary to gather and evaluate data on local problems. See *Turner, supra,* at 665–666; *Erie, supra,* at 297–298 (plurality opinion). We are also guided by the fact that *Renton* requires that municipal ordinances receive only intermediate scrutiny if they are content neutral. 475 U. S., at 48–50. There is less reason to be concerned that municipalities will use these ordinances to discriminate against unpopular speech. See *Erie, supra,* at 298–299.

JUSTICE SOUTER would have us rethink this balance, and indeed the entire *Renton* framework. In *Renton,* the Court distinguished the inquiry into whether a municipal ordinance is content neutral from the inquiry into whether it is "designed to serve a substantial government interest and do not unreasonably limit alternative avenues of communication." 475 U. S., at 47–54. The former requires courts to verify that the "predominate concerns" motivating the

ordinance "were with the secondary effects of adult [speech], and not with the content of adult [speech]." *Id.*, at 47 (emphasis deleted). The latter inquiry goes one step further and asks whether the municipality can demonstrate a connection between the speech regulated by the ordinance and the secondary effects that motivated the adoption of the ordinance. Only at this stage did *Renton* contemplate that courts would examine evidence concerning regulated speech and secondary effects. *Id.*, at 50–52. JUSTICE SOUTER would either merge these two inquiries or move the evidentiary analysis into the inquiry on content neutrality, and raise the evidentiary bar that a municipality must pass. His logic is that verifying that the ordinance actually reduces the secondary effects asserted would ensure that zoning regulations are not merely content-based regulations in disguise. See *post*, at 457–458.

We think this proposal unwise. First, none of the parties request the Court to depart from the *Renton* framework. Nor is the proposal fairly encompassed in the question presented, which focuses on the sorts of evidence upon which the city may rely to demonstrate that its ordinance is designed to serve a substantial governmental interest. Pet. for Cert. i. Second, there is no evidence suggesting that courts have difficulty determining whether municipal ordinances are motivated primarily by the content of adult speech or by its secondary effects without looking to evidence connecting such speech to the asserted secondary effects. In this case, the Court of Appeals has not yet had an opportunity to address the issue, having assumed for the sake of argument that the city's ordinance is content neutral. 222 F. 3d, at 723. It would be inappropriate for this Court to reach the question of content neutrality before permitting the lower court to pass upon it. Finally, JUSTICE SOUTER does not clarify the sort of evidence upon which municipalities may rely to meet the evidentiary burden he would require. It is easy to say that courts must demand evidence

when "common experience" or "common assumptions" are incorrect, see *post*, at 459, but it is difficult for courts to know ahead of time whether that condition is met. Municipalities will, in general, have greater experience with and understanding of the secondary effects that follow certain protected speech than will the courts. See *Erie*, 529 U. S., at 297–298 (plurality opinion). For this reason our cases require only that municipalities rely upon evidence that is "'reasonably believed to be relevant'" to the secondary effects that they seek to address. *Id.*, at 296.

### III

The city of Los Angeles argues that its prohibition on multiuse establishments draws further support from a study of the poor health conditions in adult video arcades described in *Hart Book Stores*, a case that upheld a North Carolina ordinance similar to that challenged here. See 612 F. 2d, at 828–829, n. 9. Respondents argue that the city cannot rely on evidence from *Hart Book Stores* because the city cannot prove it examined that evidence before it enacted the current version of § 12.70(C). Brief for Respondents 21. Respondents note, moreover, that unsanitary conditions in adult video arcades would persist regardless of whether arcades were operated in the same buildings as, say, adult bookstores. *Ibid.*

We do not, however, need to resolve the parties' dispute over evidence cited in *Hart Book Stores*. Unlike the city of Renton, the city of Los Angeles conducted its own study of adult businesses. We have concluded that the Los Angeles study provides evidence to support the city's theory that a concentration of adult operations in one locale attracts crime, and can be reasonably relied upon to demonstrate that Los Angeles Municipal Code § 12.70(C) (1983) is designed to promote the city's interest in reducing crime. Therefore, the city need not present foreign studies to overcome the summary judgment against it.

Before concluding, it should be noted that respondents argue, as an alternative basis to sustain the Court of Appeals' judgment, that the Los Angeles ordinance is not a typical zoning regulation. Rather, respondents explain, the prohibition on multiuse adult establishments is effectively a ban on adult video arcades because no such business exists independently of an adult bookstore. Brief for Respondents 12–13. Respondents request that the Court hold that the Los Angeles ordinance is not a time, place, and manner regulation, and that the Court subject the ordinance to strict scrutiny. This also appears to be the theme of JUSTICE KENNEDY's concurrence. He contends that "[a] city may not assert that it will reduce secondary effects by reducing speech in the same proportion." *Post*, at 449 (opinion concurring in judgment). We consider that unobjectionable proposition as simply a reformulation of the requirement that an ordinance warrants intermediate scrutiny only if it is a time, place, and manner regulation and not a ban. The Court of Appeals held, however, that the city's prohibition on the combination of adult bookstores and arcades is not a ban and respondents did not petition for review of that determination.

Accordingly, we reverse the Court of Appeals' judgment granting summary judgment to respondents and remand the case for further proceedings.

*It is so ordered.*

JUSTICE SCALIA, concurring.

I join the plurality opinion because I think it represents a correct application of our jurisprudence concerning regulation of the "secondary effects" of pornographic speech. As I have said elsewhere, however, in a case such as this our First Amendment traditions make "secondary effects" analysis quite unnecessary. The Constitution does not prevent those communities that wish to do so from regulating, or indeed entirely suppressing, the business of pander-

ing sex. See, *e. g., Erie* v. *Pap's A. M.,* 529 U. S. 277, 310 (2000) (SCALIA, J., concurring in judgment); *FW/PBS, Inc.* v. *Dallas,* 493 U. S. 215, 256–261 (1990) (SCALIA, J., concurring in part and dissenting in part).

JUSTICE KENNEDY, concurring in the judgment.

Speech can produce tangible consequences. It can change minds. It can prompt actions. These primary effects signify the power and the necessity of free speech. Speech can also cause secondary effects, however, unrelated to the impact of the speech on its audience. A newspaper factory may cause pollution, and a billboard may obstruct a view. These secondary consequences are not always immune from regulation by zoning laws even though they are produced by speech.

Municipal governments know that high concentrations of adult businesses can damage the value and the integrity of a neighborhood. The damage is measurable; it is all too real. The law does not require a city to ignore these consequences if it uses its zoning power in a reasonable way to ameliorate them without suppressing speech. A city's "interest in attempting to preserve the quality of urban life is one that must be accorded high respect." *Young* v. *American Mini Theatres, Inc.,* 427 U. S. 50, 71 (1976) (plurality opinion).

The question in this case is whether Los Angeles can seek to reduce these tangible, adverse consequences by separating adult speech businesses from one another—even two businesses that have always been under the same roof. In my view our precedents may allow the city to impose its regulation in the exercise of the zoning authority. The city is not, at least, to be foreclosed by summary judgment, so I concur in the judgment.

This separate statement seems to me necessary, however, for two reasons. First, *Renton* v. *Playtime Theatres, Inc.,* 475 U. S. 41 (1986), described a similar ordinance as "content neutral," and I agree with the dissent that the designation

is imprecise. Second, in my view, the plurality's application of *Renton* might constitute a subtle expansion, with which I do not concur.

## I

In *Renton*, the Court determined that while the material inside adult bookstores and movie theaters is speech, the consequent sordidness outside is not. The challenge is to correct the latter while leaving the former, as far as possible, untouched. If a city can decrease the crime and blight associated with certain speech by the traditional exercise of its zoning power, and at the same time leave the quantity and accessibility of the speech substantially undiminished, there is no First Amendment objection. This is so even if the measure identifies the problem outside by reference to the speech inside—that is, even if the measure is in that sense content based.

On the other hand, a city may not regulate the secondary effects of speech by suppressing the speech itself. A city may not, for example, impose a content-based fee or tax. See *Arkansas Writers' Project, Inc.* v. *Ragland*, 481 U. S. 221, 230 (1987) ("[O]fficial scrutiny of the content of publications as the basis for imposing a tax is entirely incompatible with the First Amendment's guarantee of freedom of the press"). This is true even if the government purports to justify the fee by reference to secondary effects. See *Forsyth County* v. *Nationalist Movement*, 505 U. S. 123, 134–135 (1992). Though the inference may be inexorable that a city could reduce secondary effects by reducing speech, this is not a permissible strategy. The purpose and effect of a zoning ordinance must be to reduce secondary effects and not to reduce speech.

A zoning measure can be consistent with the First Amendment if it is likely to cause a significant decrease in secondary effects and a trivial decrease in the quantity of speech. It is well documented that multiple adult businesses in close proximity may change the character of a neighborhood

for the worse. Those same businesses spread across the city may not have the same deleterious effects. At least in theory, a dispersal ordinance causes these businesses to separate rather than to close, so negative externalities are diminished but speech is not.

The calculus is a familiar one to city planners, for many enterprises other than adult businesses also cause undesirable externalities. Factories, for example, may cause pollution, so a city may seek to reduce the cost of that externality by restricting factories to areas far from residential neighborhoods. With careful urban planning a city in this way may reduce the costs of pollution for communities, while at the same time allowing the productive work of the factories to continue. The challenge is to protect the activity inside while controlling side effects outside.

Such an ordinance might, like a speech restriction, be "content based." It might, for example, single out slaughterhouses for specific zoning treatment, restricting them to a particularly remote part of town. Without knowing more, however, one would hardly presume that because the ordinance is specific to that business, the city seeks to discriminate against it or help a favored group. One would presume, rather, that the ordinance targets not the business but its particular noxious side effects. But cf. *Slaughter-House Cases*, 16 Wall. 36 (1873). The business might well be the city's most valued enterprise; nevertheless, because of the pollution it causes, it may warrant special zoning treatment. This sort of singling out is not impermissible content discrimination; it is sensible urban planning. Cf. *Village of Euclid* v. *Ambler Realty Co.*, 272 U. S. 365, 388 (1926) ("A nuisance may be merely a right thing in the wrong place,—like a pig in the parlor instead of the barnyard. If the validity of the legislative classification for zoning purposes be fairly debatable, the legislative judgment must be allowed to control").

True, the First Amendment protects speech and not slaughterhouses. But in both contexts, the inference of impermissible discrimination is not strong. An equally strong inference is that the ordinance is targeted not at the activity, but at its side effects. If a zoning ordinance is directed to the secondary effects of adult speech, the ordinance does not necessarily constitute impermissible content discrimination. A zoning law need not be blind to the secondary effects of adult speech, so long as the purpose of the law is not to suppress it.

The ordinance at issue in this case is not limited to expressive activities. It also extends, for example, to massage parlors, which the city has found to cause similar secondary effects. See Los Angeles Municipal Code §§ 12.70(B)(8) (1978), 12.70(B)(17) (1983), 12.70(C) (1986), as amended. This ordinance, moreover, is just one part of an elaborate web of land-use regulations in Los Angeles, all of which are intended to promote the social value of the land as a whole without suppressing some activities or favoring others. See § 12.02 ("The purpose of this article is to consolidate and coordinate all existing zoning regulations and provisions into one comprehensive zoning plan . . . in order to encourage the most appropriate use of land . . . and to promote the health, safety, and the general welfare . . ."). All this further suggests that the ordinance is more in the nature of a typical land-use restriction and less in the nature of a law suppressing speech.

For these reasons, the ordinance is not so suspect that we must employ the usual rigorous analysis that content-based laws demand in other instances. The ordinance may be a covert attack on speech, but we should not presume it to be so. In the language of our First Amendment doctrine it calls for intermediate and not strict scrutiny, as we held in *Renton.*

## II

In *Renton*, the Court began by noting that a zoning ordinance is a time, place, or manner restriction. The Court then proceeded to consider the question whether the ordinance was "content based." The ordinance "by its terms [was] designed to prevent crime, protect the city's retail trade, maintain property values, and generally protec[t] and preserv[e] the quality of [the city's] neighborhoods, commercial districts, and the quality of urban life, not to suppress the expression of unpopular views." 475 U. S., at 48 (internal quotation marks omitted). On this premise, the Court designated the restriction "content neutral." *Ibid.*

The Court appeared to recognize, however, that the designation was something of a fiction, which, perhaps, is why it kept the phrase in quotes. After all, whether a statute is content neutral or content based is something that can be determined on the face of it; if the statute describes speech by content then it is content based. And the ordinance in *Renton* "treat[ed] theaters that specialize in adult films differently from other kinds of theaters." *Id.*, at 47. The fiction that this sort of ordinance is content neutral—or "content neutral"—is perhaps more confusing than helpful, as JUSTICE SOUTER demonstrates, see *post*, at 457 (dissenting opinion). It is also not a fiction that has commanded our consistent adherence. See *Thomas* v. *Chicago Park Dist.*, 534 U. S. 316, 322, and n. 2 (2002) (suggesting that a licensing scheme targeting only those businesses purveying sexually explicit speech is not content neutral). These ordinances are content based, and we should call them so.

Nevertheless, for the reasons discussed above, the central holding of *Renton* is sound: A zoning restriction that is designed to decrease secondary effects and not speech should be subject to intermediate rather than strict scrutiny. Generally, the government has no power to restrict speech based on content, but there are exceptions to the rule. See *Simon & Schuster, Inc.* v. *Members of N. Y. State Crime*

*Victims Bd.*, 502 U. S. 105, 126–127 (1991) (KENNEDY, J., concurring in judgment). And zoning regulations do not automatically raise the specter of impermissible content discrimination, even if they are content based, because they have a prima facie legitimate purpose: to limit the negative externalities of land use. As a matter of common experience, these sorts of ordinances are more like a zoning restriction on slaughterhouses and less like a tax on unpopular newspapers. The zoning context provides a built-in legitimate rationale, which rebuts the usual presumption that content-based restrictions are unconstitutional. For this reason, we apply intermediate rather than strict scrutiny.

## III

The narrow question presented in this case is whether the ordinance at issue is invalid "because the city did not study the negative effects of such combinations of adult businesses, but rather relied on judicially approved statutory precedent from other jurisdictions." Pet. for Cert. i. This question is actually two questions. First, what proposition does a city need to advance in order to sustain a secondary-effects ordinance? Second, how much evidence is required to support the proposition? The plurality skips to the second question and gives the correct answer; but in my view more attention must be given to the first.

At the outset, we must identify the claim a city must make in order to justify a content-based zoning ordinance. As discussed above, a city must advance some basis to show that its regulation has the purpose and effect of suppressing secondary effects, while leaving the quantity and accessibility of speech substantially intact. The ordinance may identify the speech based on content, but only as a shorthand for identifying the secondary effects outside. A city may not assert that it will reduce secondary effects by reducing speech in the same proportion. On this point, I agree with JUSTICE SOUTER. See *post*, at 457. The rationale of

the ordinance must be that it will suppress secondary effects—and not by suppressing speech.

The plurality's statement of the proposition to be supported is somewhat different. It suggests that Los Angeles could reason as follows: (1) "a concentration of operations in one locale draws . . . a greater concentration of adult consumers to the neighborhood, and a high density of such consumers either attracts or generates criminal activity"; (2) "having a number of adult operations in one single adult establishment draws the same dense foot traffic as having a number of distinct adult establishments in close proximity"; (3) "reducing the concentration of adult operations in a neighborhood, whether within separate establishments or in one large establishment, will reduce crime rates." *Ante*, at 436.

These propositions all seem reasonable, and the inferences required to get from one to the next are sensible. Nevertheless, this syllogism fails to capture an important part of the inquiry. The plurality's analysis does not address how speech will fare under the city's ordinance. As discussed, the necessary rationale for applying intermediate scrutiny is the promise that zoning ordinances like this one may reduce the costs of secondary effects without substantially reducing speech. For this reason, it does not suffice to say that inconvenience will reduce demand and fewer patrons will lead to fewer secondary effects. This reasoning would as easily justify a content-based tax: Increased prices will reduce demand, and fewer customers will mean fewer secondary effects. But a content-based tax may not be justified in this manner. See *Arkansas Writers' Project, Inc.* v. *Ragland*, 481 U. S. 221 (1987); *Forsyth County* v. *Nationalist Movement*, 505 U. S. 123 (1992). It is no trick to reduce secondary effects by reducing speech or its audience; but a city may not attack secondary effects indirectly by attacking speech.

The analysis requires a few more steps. If two adult businesses are under the same roof, an ordinance requiring them

to separate will have one of two results: One business will either move elsewhere or close. The city's premise cannot be the latter. It is true that cutting adult speech in half would probably reduce secondary effects proportionately. But again, a promised proportional reduction does not suffice. Content-based taxes could achieve that, yet these are impermissible.

The premise, therefore, must be that businesses—even those that have always been under one roof—will for the most part disperse rather than shut down. True, this premise has its own conundrum. As JUSTICE SOUTER writes, "[t]he city . . . claims no interest in the proliferation of adult establishments." *Post*, at 461. The claim, therefore, must be that this ordinance will cause two businesses to split rather than one to close, that the quantity of speech will be substantially undiminished, and that total secondary effects will be significantly reduced. This must be the rationale of a dispersal statute.

Only after identifying the proposition to be proved can we ask the second part of the question presented: is there sufficient evidence to support the proposition? As to this, we have consistently held that a city must have latitude to experiment, at least at the outset, and that very little evidence is required. See, *e. g.*, *Renton*, 475 U. S., at 51–52 ("The First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses"); *Young*, 427 U. S., at 71 ("[T]he city must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems"); *Erie* v. *Pap's A. M.*, 529 U. S. 277, 300–301 (2000) (plurality opinion). As a general matter, courts should not be in the business of second-guessing fact-bound empirical assessments of city planners. See *Renton, supra*, at 51–52. The Los Angeles City Coun-

cil knows the streets of Los Angeles better than we do. See *Turner Broadcasting System, Inc.* v. *FCC*, 512 U. S. 622, 665–666 (1994); *Erie, supra,* at 297–298 (plurality opinion). It is entitled to rely on that knowledge; and if its inferences appear reasonable, we should not say there is no basis for its conclusion.

In this case the proposition to be shown is supported by a single study and common experience. The city's study shows a correlation between the concentration of adult establishments and crime. Two or more adult businesses in close proximity seem to attract a critical mass of unsavory characters, and the crime rate may increase as a result. The city, therefore, sought to disperse these businesses. Los Angeles Municipal Code § 12.70(C) (1983), as amended. This original ordinance is not challenged here, and we may assume that it is constitutional.

If we assume that the study supports the original ordinance, then most of the necessary analysis follows. We may posit that two adult stores next door to each other attract 100 patrons per day. The two businesses split apart might attract 49 patrons each. (Two patrons, perhaps, will be discouraged by the inconvenience of the separation—a relatively small cost to speech.) On the other hand, the reduction in secondary effects might be dramatic, because secondary effects may require a critical mass. Depending on the economics of vice, 100 potential customers/victims might attract a coterie of thieves, prostitutes, and other ne'er-do-wells; yet 49 might attract none at all. If so, a dispersal ordinance would cause a great reduction in secondary effects at very small cost to speech. Indeed, the very absence of secondary effects might increase the audience for the speech; perhaps for every two people who are discouraged by the inconvenience of two-stop shopping, another two are encouraged by hospitable surroundings. In that case, secondary effects might be eliminated at no cost to

speech whatsoever, and both the city and the speaker will have their interests well served.

Only one small step remains to justify the ordinance at issue in this case. The city may next infer—from its study and from its own experience—that two adult businesses under the same roof are no better than two next door. The ·city could reach the reasonable conclusion that knocking down the wall between two adult businesses does not ameliorate any undesirable secondary effects of their proximity to one another. If the city's first ordinance was justified, therefore, then the second is too. Dispersing two adult businesses under one roof is reasonably likely to cause a substantial reduction in secondary effects while reducing speech very little.

## IV

These propositions are well established in common experience and in zoning policies that we have already examined, and for these reasons this ordinance is not invalid on its face. If these assumptions can be proved unsound at trial, then the ordinance might not withstand intermediate scrutiny. The ordinance does, however, survive the summary judgment motion that the Court of Appeals ordered granted in this case.

JUSTICE SOUTER, with whom JUSTICE STEVENS and JUSTICE GINSBURG join, and with.whom JUSTICE BREYER joins as to Part II, dissenting.

In 1977, the city of Los Angeles studied sections of the city with high and low concentrations of adult business establishments catering to the market for the erotic. The city found no certain correlation between the location of those establishments and depressed property values, but it did find some correlation between areas of higher concentrations of such business and higher crime rates. On that basis, Los Angeles followed the examples of other cities in adopting a zoning ordinance requiring dispersion of adult

establishments. I assume that the ordinance was constitutional when adopted, see, *e. g., Young* v. *American Mini Theatres, Inc.*, 427 U. S. 50 (1976), and assume for purposes of this case that the original ordinance remains valid today.[1]

The city subsequently amended its ordinance to forbid clusters of such businesses at one address, as in a mall. The city has, in turn, taken a third step to apply this amendment to prohibit even a single proprietor from doing business in a traditional way that combines an adult bookstore, selling books, magazines, and videos, with an adult arcade, consisting of open viewing booths, where potential purchasers of videos can view them for a fee.

From a policy of dispersing adult establishments, the city has thus moved to a policy of dividing them in two. The justification claimed for this application of the new policy remains, however, the 1977 survey, as supplemented by the authority of one decided case on regulating adult arcades in another State. The case authority is not on point, see *infra*, at 461–462, n. 4, and the 1977 survey provides no support for the breakup policy. Its evidentiary insufficiency bears emphasis and is the principal reason that I respectfully dissent from the Court's judgment today.

## I

This ordinance stands or falls on the results of what our cases speak of as intermediate scrutiny, generally contrasted with the demanding standard applied under the First Amendment to a content-based regulation of expression. The variants of middle-tier tests cover a grab bag of restrictive statutes, with a corresponding variety of justifications.

---

[1] Although *amicus* First Amendment Lawyers Association argues that recent studies refute the findings of adult business correlations with secondary effects sufficient to justify such an ordinance, Brief for First Amendment Lawyers Association as *Amicus Curiae* 21–23, the issue is one I do not reach.

While spoken of as content neutral, these regulations are not uniformly distinct from the content-based regulations calling for scrutiny that is strict, and zoning of businesses based on their sales of expressive adult material receives mid-level scrutiny, even though it raises a risk of content-based restriction. It is worth being clear, then, on how close to a content basis adult business zoning can get, and why the application of a middle-tier standard to zoning regulation of adult bookstores calls for particular care.

Because content-based regulation applies to expression by very reason of what is said, it carries a high risk that expressive limits are imposed for the sake of suppressing a message that is disagreeable to listeners or readers, or the government. See *Consolidated Edison Co. of N. Y.* v. *Public Serv. Comm'n of N. Y.*, 447 U. S. 530, 536 (1980) ("[W]hen regulation is based on the content of speech, governmental action must be scrutinized more carefully to ensure that communication has not been prohibited merely because public officials disapprove the speaker's views" (internal quotation marks omitted)). A restriction based on content survives only on a showing of necessity to serve a legitimate and compelling governmental interest, combined with least restrictive narrow tailoring to serve it, see *United States* v. *Playboy Entertainment Group, Inc.*, 529 U. S. 803, 813 (2000); since merely protecting listeners from offense at the message is not a legitimate interest of the government, see *Cohen* v. *California*, 403 U. S. 15, 24–25 (1971), strict scrutiny leaves few survivors.

The comparatively softer intermediate scrutiny is reserved for regulations justified by something other than content of the message, such as a straightforward restriction going only to the time, place, or manner of speech or other expression. It is easy to see why review of such a regulation may be relatively relaxed. No one has to disagree with any message to find something wrong with a loudspeaker at three in the morning, see *Kovacs* v. *Cooper*, 336 U. S. 77

(1949); the sentiment may not provoke, but being blasted out of a sound sleep does. In such a case, we ask simply whether the regulation is "narrowly tailored to serve a significant governmental interest, and . . . leave[s] open ample alternative channels for communication of the information." *Clark* v. *Community for Creative Non-Violence*, 468 U. S. 288, 293 (1984). A middle-tier standard is also applied to limits on expression through action that is otherwise subject to regulation for nonexpressive purposes, the best known example being the prohibition on destroying draft cards as an act of protest, *United States* v. *O'Brien*, 391 U. S. 367 (1968); here a regulation passes muster "if it furthers an important or substantial governmental interest . . . unrelated to the suppression of free expression" by a restriction "no greater than is essential to the furtherance of that interest," *id.*, at 377. As mentioned already, yet another middle-tier variety is zoning restriction as a means of responding to the "secondary effects" of adult businesses, principally crime and declining property values in the neighborhood. *Renton* v. *Playtime Theatres, Inc.*, 475 U. S. 41, 49 (1986).[2]

Although this type of land-use restriction has even been called a variety of time, place, or manner regulation, *id.*, at 46, equating a secondary-effects zoning regulation with a mere regulation of time, place, or manner jumps over an important difference between them. A restriction on loudspeakers has no obvious relationship to the substance of

---

[2] Limiting such effects qualifies as a substantial governmental interest, and an ordinance has been said to survive if it is shown to serve such ends without unreasonably limiting alternatives. *Renton*, 475 U. S., at 50. Because *Renton* called its secondary-effects ordinance a mere time, place, or manner restriction and thereby glossed over the role of content in secondary-effects zoning, see *infra* this page and 457, I believe the soft focus of its statement of the middle-tier test should be rejected in favor of the *United States* v. *O'Brien*, 391 U. S. 367 (1968), formulation quoted above. *O'Brien* is a closer relative of secondary-effects zoning than mere time, place, or manner regulations, as the Court has implicitly recognized. *Erie* v. *Pap's A. M.*, 529 U. S. 277, 289 (2000) (plurality opinion).

what is broadcast, while a zoning regulation of businesses in adult expression just as obviously does. And while it may be true that an adult business is burdened only because of its secondary effects, it is clearly burdened only if its expressive products have adult content. Thus, the Court has recognized that this kind of regulation, though called content neutral, occupies a kind of limbo between full-blown, content-based restrictions and regulations that apply without any reference to the substance of what is said. *Id.*, at 47.

It would in fact make sense to give this kind of zoning regulation a First Amendment label of its own, and if we called it content correlated, we would not only describe it for what it is, but keep alert to a risk of content-based regulation that it poses. The risk lies in the fact that when a law applies selectively only to speech of particular content, the more precisely the content is identified, the greater is the opportunity for government censorship. Adult speech refers not merely to sexually explicit content, but to speech reflecting a favorable view of being explicit about sex and a favorable view of the practices it depicts; a restriction on adult content is thus also a restriction turning on a particular viewpoint, of which the government may disapprove.

This risk of viewpoint discrimination is subject to a relatively simple safeguard, however. If combating secondary effects of property devaluation and crime is truly the reason for the regulation, it is possible to show by empirical evidence that the effects exist, that they are caused by the expressive activity subject to the zoning, and that the zoning can be expected either to ameliorate them or to enhance the capacity of the government to combat them (say, by concentrating them in one area), without suppressing the expressive activity itself. This capacity of zoning regulation to address the practical problems without eliminating the speech is, after all, the only possible excuse for speaking of secondary-effects zoning as akin to time, place, or manner regulations.

In examining claims that there are causal relationships between adult businesses and an increase in secondary effects (distinct from disagreement), and between zoning and the mitigation of the effects, stress needs to be placed on the empirical character of the demonstration available. See *Metromedia, Inc.* v. *San Diego,* 453 U. S. 490, 510 (1981) ("[J]udgments . . . defying objective evaluation . . . must be carefully scrutinized to determine if they are only a public rationalization of an impermissible purpose"); *Young,* 427 U. S., at 84 (Powell, J., concurring) ("[C]ourts must be alert . . . to the possibility of using the power to zone as a pretext for suppressing expression"). The weaker the demonstration of facts distinct from disapproval of the "adult" viewpoint, the greater the likelihood that nothing more than condemnation of the viewpoint drives the regulation.[3]

Equal stress should be placed on the point that requiring empirical justification of claims about property value or crime is not demanding anything Herculean. Increased crime, like prostitution and muggings, and declining property values in areas surrounding adult businesses, are all readily observable, often to the untrained eye and certainly to the police officer and urban planner. These harms can be shown by police reports, crime statistics, and studies of mar-

---

[3] Regulation of commercial speech, which is like secondary-effects zoning in being subject to an intermediate level of First Amendment scrutiny, see *Central Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n of N. Y.,* 447 U. S. 557, 569 (1980), provides an instructive parallel in the cases enforcing an evidentiary requirement to ensure that an asserted rationale does not cloak an illegitimate governmental motive. See, *e. g., Rubin* v. *Coors Brewing Co.,* 514 U. S. 476, 487 (1995); *Edenfield* v. *Fane,* 507 U. S. 761 (1993). The government's "burden is not satisfied by mere speculation or conjecture," but only by "demonstrat[ing] that the harms [the government] recites are real and that its restriction will in fact alleviate them to a material degree." *Id.,* at 770–771. For unless this "critical" requirement is met, *Rubin, supra,* at 487, "a State could with ease restrict commercial speech in the service of other objectives that could not themselves justify a burden on commercial expression," *Edenfield, supra,* at 771.

ket value, all of which are within a municipality's capacity or available from the distilled experiences of comparable communities. See, *e. g., Renton, supra,* at 51; *Young, supra,* at 55.

And precisely because this sort of evidence is readily available, reviewing courts need to be wary when the government appeals, not to evidence, but to an uncritical common sense in an effort to justify such a zoning restriction. It is not that common sense is always illegitimate in First Amendment demonstration. The need for independent proof varies with the point that has to be established, and zoning can be supported by common experience when there is no reason to question it. We have appealed to common sense in analogous cases, even if we have disagreed about how far it took us. See *Erie* v. *Pap's A. M.,* 529 U. S. 277, 300–301 (2000) (plurality opinion); *id.,* at 313, and n. 2 (SOUTER, J., concurring in part and dissenting in part). But we must be careful about substituting common assumptions for evidence, when the evidence is as readily available as public statistics and municipal property valuations, lest we find out when the evidence is gathered that the assumptions are highly debatable. The record in this very case makes the point. It has become a commonplace, based on our own cases, that concentrating adult establishments drives down the value of neighboring property used for other purposes. See *Renton,* 475 U. S., at 51; *Young, supra,* at 55. In fact, however, the city found that general assumption unjustified by its 1977 study. App. 39, 45.

The lesson is that the lesser scrutiny applied to content-correlated zoning restrictions is no excuse for a government's failure to provide a factual demonstration for claims it makes about secondary effects; on the contrary, this is what demands the demonstration. See, *e. g., Schad* v. *Mount Ephraim,* 452 U. S. 61, 72–74 (1981). In this case, however, the government has not shown that bookstores containing viewing booths, isolated from other adult establishments, in-

crease crime or produce other negative secondary effects in surrounding neighborhoods, and we are thus left without substantial justification for viewing the city's First Amendment restriction as content correlated but not simply content based. By the same token, the city has failed to show any causal relationship between the breakup policy and elimination or regulation of secondary effects.

## II

Our cases on the subject have referred to studies, undertaken with varying degrees of formality, showing the geographical correlations between the presence or concentration of adult business establishments and enhanced crime rates or depressed property values. See, e. g., *Renton, supra,* at 50–51; *Young,* 427 U. S., at 55. Although we have held that intermediate scrutiny of secondary-effects legislation does not demand a fresh evidentiary study of its factual basis if the published results of investigations elsewhere are "reasonably" thought to be applicable in a different municipal setting, *Renton, supra,* at 51–52, the city here took responsibility to make its own enquiry, App. 35–162. As already mentioned, the study was inconclusive as to any correlation between adult business and lower property values, *id.,* at 45, and it reported no association between higher crime rates and any isolated adult establishments. But it did find a geographical correlation of higher concentrations of adult establishments with higher crime rates, *id.,* at 43, and with this study in hand, Los Angeles enacted its 1978 ordinance requiring dispersion of adult stores and theaters. This original position of the ordinance is not challenged today, and I will assume its justification on the theory accepted in *Young,* that eliminating concentrations of adult establishments will spread out the documented secondary effects and render them more manageable that way.

The application of the 1983 amendment now before us is, however, a different matter. My concern is not with the

assumption behind the amendment itself, that a conglomeration of adult businesses under one roof, as in a minimall or adult department store, will produce undesirable secondary effects comparable to what a cluster of separate adult establishments brings about, *ante*, at 436. That may or may not be so. The assumption that is clearly unsupported, however, goes to the city's supposed interest in applying the amendment to the book and video stores in question, and in applying it to break them up. The city, of course, claims no interest in the proliferation of adult establishments, the ostensible consequence of splitting the sales and viewing activities so as to produce two stores where once there was one. Nor does the city assert any interest in limiting the sale of adult expressive material as such, or reducing the number of adult video booths in the city, for that would be clear content-based regulation, and the city was careful in its 1977 report to disclaim any such intent. App. 54.[4]

---

[4] Finally, the city does not assert an interest in curbing any secondary effects within the combined bookstore-arcades. In *Hart Book Stores, Inc. v. Edmisten*, 612 F. 2d 821 (1979), the Fourth Circuit upheld a similar ban in North Carolina, relying in part on a county health department report on the results of an inspection of several of the combined adult bookstore-video arcades in Wake County, North Carolina. *Id.*, at 828–829, n. 9. The inspection revealed unsanitary conditions and evidence of salacious activities taking place within the video cubicles. *Ibid.* The city introduces this case to defend its breakup policy although it is not clear from the opinion how separating these video arcades from the adult bookstores would deter the activities that took place within them. In any event, while *Renton* v. *Playtime Theatres, Inc.*, 475 U. S. 41 (1986), allowed a city to rely on the experiences and studies of other cities, it did not dispense with the requirement that "whatever evidence the city relies upon [be] reasonably believed to be relevant to the problem that the city addresses," *id.*, at 51–52, and the evidence relied upon by the Fourth Circuit is certainly not necessarily relevant to the Los Angeles ordinance. Since November 1977, five years before the enactment of the ordinance at issue, Los Angeles has regulated adult video booths, prohibiting doors, setting minimum levels of lighting, and requiring that their interiors be fully visible from the entrance to the premises. Los Angeles Municipal Code §§ 103.101(i), (j). Thus, it seems less likely that the un-

Rather, the city apparently assumes that a bookstore selling videos and providing viewing booths produces secondary effects of crime, and more crime than would result from having a single store without booths in one part of town and a video arcade in another.[5] But the city neither says this in so many words nor proffers any evidence to support even the simple proposition that an otherwise lawfully located adult bookstore combined with video booths will produce any criminal effects. The Los Angeles study treats such combined stores as one, see *id.*, at 81–82, and draws no general conclusion that individual stores spread apart from other adult establishments (as under the basic Los Angeles ordinance) are associated with any degree of criminal activity above the general norm; nor has the city called the Court's attention to any other empirical study, or even anecdotal police evidence, that supports the city's assumption. In fact, if the Los Angeles study sheds any light whatever on the city's position, it is the light of skepticism, for we may fairly suspect that the study said nothing about the secondary effects of freestanding stores because no effects were observed. The reasonable supposition, then, is that splitting some of them up will have no consequence for secondary effects whatever.[6]

---

sanitary conditions identified in *Hart Book Stores* would exist in video arcades in Los Angeles, and the city has suggested no evidence that they do. For that reason, *Hart Book Stores* gives no indication of a substantial governmental interest that the ban on multiuse adult establishments would further.

[5] The plurality indulges the city's assumption but goes no further to justify it than stating what is obvious from what the city's study says about concentrations of adult establishments (but not isolated ones): the presence of several adult businesses in one neighborhood draws "a greater concentration of adult consumers to the neighborhood, [which] either attracts or generates criminal activity." *Ante*, at 436.

[6] In *Renton*, the Court approved a zoning ordinance "aimed at preventing the secondary effects caused by the presence of even one such theater

The inescapable point is that the city does not even claim that the 1977 study provides any support for its assumption. We have previously accepted studies, like the city's own study here, as showing a causal connection between concentrations of adult business and identified secondary effects.[7] Since that is an acceptable basis for requiring adult businesses to disperse when they are housed in separate premises, there is certainly a relevant argument to be made that restricting their concentration at one spacious address should have some effect on sales and traffic, and effects in the neighborhood. But even if that argument may justify a ban on adult "minimalls," *ante*, at 436, it provides no support for what the city proposes to do here. The bookstores involved here are not concentrations of traditionally separate adult businesses that have been studied and shown to have an association with secondary effects, and they exemplify no new form of concentration like a mall under one roof. They are combinations of selling and viewing activities that have commonly been combined, and the plurality itself recognizes, *ante*, at 438, that no study conducted by the city has reported that this type of traditional business, any more than any other adult business, has a correlation with secondary effects

in a given neighborhood." 475 U. S., at 50. The city, however, does not appeal to that decision to show that combined bookstore-arcades isolated from other adult establishments, like the theaters in *Renton*, give rise to negative secondary effects, perhaps recognizing that such a finding would only call into doubt the sensibility of the city's decision to proliferate such businesses. See *ante*, at 438. Although the question may be open whether a city can rely on the experiences of other cities when they contradict its own studies, that question is not implicated here, as Los Angeles relies exclusively on its own study, which is tellingly silent on the question whether isolated adult establishments have any bearing on criminal activity.

[7] As already noted, n. 1, *supra, amicus* First Amendment Lawyers Association argues that more recent studies show no such thing, but this case involves no such challenge to the previously accepted causal connection.

in the absence of concentration with other adult establishments in the neighborhood. And even if splitting viewing booths from the bookstores that continue to sell videos were to turn some customers away (or send them in search of video arcades in other neighborhoods), it is nothing but speculation to think that marginally lower traffic to one store would have any measurable effect on the neighborhood, let alone an effect on associated crime that has never been shown to exist in the first place.[8]

Nor is the plurality's position bolstered, as it seems to think, *ante*, at 439, by relying on the statement in *Renton* that courts should allow cities a "'reasonable opportunity to experiment with solutions to admittedly serious problems,'" 475 U. S., at 52. The plurality overlooks a key distinction between the zoning regulations at issue in *Renton* and

---

[8] JUSTICE KENNEDY would indulge the city in this speculation, so long as it could show that the ordinance will "leav[e] the quantity and accessibility of speech substantially intact." *Ante*, at 449 (opinion concurring in judgment). But the suggestion that the speculated consequences may justify content-correlated regulation if speech is only slightly burdened turns intermediate scrutiny on its head. Although the goal of intermediate scrutiny is to filter out laws that unduly burden speech, this is achieved by examining the asserted governmental interest, not the burden on speech, which must simply be no greater than necessary to further that interest. *Erie*, 529 U. S., at 301; see also n. 2, *supra*. Nor has JUSTICE KENNEDY even shown that this ordinance leaves speech "substantially intact." He posits an example in which two adult stores draw 100 customers, and each business operating separately draws 49. *Ante*, at 452. It does not follow, however, that a combined bookstore-arcade that draws 100 customers, when split, will yield a bookstore and arcade that together draw nearly that many customers. Given the now double outlays required to operate the businesses at different locations, see *infra*, at 466, the far more likely outcome is that the stand-alone video store will go out of business. (Of course, the bookstore owner could, consistently with the ordinance, continue to operate video booths at no charge, but if this were always commercially feasible then the city would face the separate problem that under no theory could a rule simply requiring that video booths be operated for free be said to reduce secondary effects.)

*Young* (and in Los Angeles as of 1978), and this new Los Angeles breakup requirement. In those two cases, the municipalities' substantial interest for purposes of intermediate scrutiny was an interest in choosing between two strategies to deal with crime or property value, each strategy tied to the businesses' location, which had been shown to have a causal connection with the secondary effects: the municipality could either concentrate businesses for a concentrated regulatory strategy, or disperse them.in order to spread out its regulatory efforts. The limitations on location required no further support than the factual basis tying location to secondary effects; the zoning approved in those two cases had no effect on the way the owners of the stores carried on their adult businesses beyond controlling location, and no heavier burden than the location limit was approved by this Court.

The Los Angeles ordinance, however, does impose a heavier burden, and one lacking any demonstrable connection to the interest in crime control. The city no longer accepts businesses as their owners choose to conduct them within their own four walls, but bars a video arcade in a bookstore, a combination shown by the record to be commercially natural, if not universal. App. 47–51, 229–230, 242. Whereas *Young* and *Renton* gave cities the choice between two strategies when each was causally related to the city's interest, the plurality today gives Los Angeles a right to "experiment" with a First Amendment restriction in response to a problem of increased crime that the city has never even shown to be associated with combined bookstore-arcades standing alone. But the government's freedom of experimentation cannot displace its burden under the intermediate scrutiny standard to show that the restriction on speech is no greater than essential to realizing an important objective, in this case policing crime. Since we cannot make even a best guess that the city's breakup policy will have any effect on crime

or law enforcement, we are a very far cry from any assurance against covert content-based regulation.[9]

And concern with content-based regulation targeting a viewpoint is right to the point here, as witness a fact that involves no guesswork. If we take the city's breakup policy at its face, enforcing it will mean that in every case two establishments will operate instead of the traditional one. Since the city presumably does not wish merely to multiply adult establishments, it makes sense to ask what offsetting gain the city may obtain from its new breakup policy. The answer may lie in the fact that two establishments in place of one will entail two business overheads in place of one: two monthly rents, two electricity bills, two payrolls. Every month business will be more expensive than it used to be, perhaps even twice as much. That sounds like a good strategy for driving out expressive adult businesses. It sounds, in other words, like a policy of content-based regulation.

I respectfully dissent.

---

[9] The plurality's assumption that the city's "motive" in applying secondary-effects zoning can be entirely compartmentalized from the proffer of evidence required to justify the zoning scheme, *ante*, at 440–441, is indulgent to an unrealistic degree, as the record in this case shows. When the original dispersion ordinance was enacted in 1978, the city's study showing a correlation between concentrations of adult business and higher crime rates showed that the dispersal of adult businesses was causally related to the city's law enforcement interest, and that in turn was a fair indication that the city's concern was with the secondary effect of higher crime rates. When, however, the city takes the further step of breaking up businesses with no showing that a traditionally combined business has any association with a higher crime rate that could be affected by the breakup, there is no indication that the breakup policy addresses a secondary effect, but there is reason to doubt that secondary effects are the city's concern. The plurality seems to ask us to shut our eyes to the city's failings by emphasizing that this case is merely at the stage of summary judgment, *ante*, at 439, but ignores the fact that at this summary judgment stage the city has made it plain that it relies on no evidence beyond the 1977 study, which provides no support for the city's action.