# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 14, 2025

Lyle W. Cayce
Clerk

_____

No. 24-50434

_____

Association of Club Executives of Texas,
Incorporated; Lone Starr Multi-Theaters, Limited, *doing
business as* New Fine Arts West; XTC Cabaret,
Incorporated, *doing business as* XTC Cabaret Austin; RCI
Dining Services (Round Rock), Incorporated, *doing business
as* Rick's Cabaret,

*Plaintiffs—Appellants,*

*versus*

Ken Paxton, *Attorney General, State of Texas*; Ed Serna, *in his official
capacity as Executive Director of the Texas Workforce Commission*,

*Defendants—Appellees.*

_____

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:21-CV-519

_____

Before Stewart, Dennis, and Haynes, *Circuit Judges*.

Carl E. Stewart, *Circuit Judge*:

No. 24-50434

In this case, our duty is to assess whether a statute's restriction on speech withstands constitutional scrutiny—not to second guess the wisdom of state legislative policy.[1] Texas Senate Bill 315 prohibits individuals under the age of 21 years old from working at sexually oriented businesses to prevent sex trafficking and sexual exploitation. Appellants sued Texas's Attorney General and the Executive Director of the Texas Workforce Commission (collectively, "Texas") challenging the constitutionality of S.B. 315 under the First Amendment. After a bench trial, the district court issued findings of fact and conclusions of law upholding S.B. 315 as constitutional. Appellants timely appealed. For the following reasons, we AFFIRM the judgment of the district court.

**I.**

*A. Statutory Background*

In 2021, the Texas Legislature enacted Senate Bill 315. Tex. S.B. 315, 87th Leg. R.S. (2021). Recognizing that sexually oriented businesses are high-risk locations for human trafficking and sexual exploitation, S.B. 315 aims to "provide necessary mechanisms" to prevent the "harmful secondary effects of sexually oriented businesses." SENATE RSCH. CTR., BILL ANAL., Tex. S.B. 315, 87th Leg. R.S. (2021).

To do so, the bill raised the age of employment at sexually oriented businesses ("SOBs") from eighteen to twenty-one years old. *See* Tex. S.B. 315, 87th Leg. R.S. (2021). In Texas, an SOB is defined as a:

> sex parlor, nude studio, modeling studio, love parlor, adult bookstore, adult movie theater, adult video arcade, adult movie arcade, adult video store, adult motel, or other commercial

---

[1] We must look at whether it does, in fact, restrict speech in addition to the other issues.

No. 24-50434

enterprise the primary business of which is the offering of a service or the selling, renting, or exhibiting of devices or any other items intended to provide sexual stimulation or sexual gratification to the customer.

TEX. LOC. GOV'T CODE ANN. § 243.002. Relevant here, S.B. 315 changed Texas laws regarding minors and SOBs in three ways.

First, S.B. 315 amended § 125.0015 of Texas's Civil Practice & Remedies Code to provide that a person maintains a "common nuisance" by "employing or entering into a contract for the performance of work or the provision of a service with an individual younger than 21 years of age for work or services performed" at an SOB.[2] Tex. S.B. 315, § 5, 87th Leg. R.S. (2021) (amending Tex. Civ. Prac. & Rem. Code § 125.0015(a)(19), (22)).

Second, S.B. 315 amended § 51.016 of the Labor Code such that, generally, "[a] sexually oriented business may not employ or enter into a contract . . . for the performance of work or the provision of a service with an individual younger than 21 [18] years of age." Tex. S.B. 315, § 6, 87th Leg. R.S. (2021) (amending Tex. Labor Code § 51.016(b)) (formatting in original). A violation of this section now constitutes a Class A misdemeanor subject to a one-year jail sentence, administrative penalties, or a suit for injunctive relief brought by the Attorney General of Texas. *See* Tex. S.B. 315, § 7, 87th Leg. R.S. (2021); Tex. Labor Code §§ 51.016(i)(3), 51.031(b).

Third, S.B. 315 amended Texas Penal Code Section 43.251 by changing the definition of "child" to mean "a person younger than 21 [18] years of age." Tex. S.B. 315, § 8, 87th Leg. R.S. (2021) (formatting in original) (amending TEX. PENAL CODE § 43.251(a)(1)). Section 43.251

---

[2] The Attorney General of Texas is authorized to bring suits to enjoin and abate such common nuisances. TEX. CIV. PRAC. & REM. CODE § 125.002(a).

criminalizes "employment harmful to children." Tᴇx. Pᴇɴᴀʟ Cᴏᴅᴇ § 43.251(a)(1). Under that provision, "[a] person commits an offense if the person employs, authorizes, or induces a child to work: (1) in a sexually oriented commercial activity; or (2) in any place of business permitting, requesting, or requiring a child to work nude or topless." *Id.* § 43.251(b)(1)–(2). Similar to an SOB, a "sexually oriented commercial activity" means a massage establishment, nude studio, modeling studio, love parlor, or other similar commercial enterprise the primary business of which is the offering of a service that is intended to provide sexual stimulation or sexual gratification to the customer. *Id.* § 43.251(a)(5). Thus, Section 43.251 effectively makes it a felony to "employ[], authorize[], or induce[]" someone under the age of 21 to work in or with an SOB.

### B. Factual Background

Appellants are the Texas Entertainment Association ("TEA"), a non-profit trade group whose membership consists of adult cabarets and adult bookstores subject to S.B. 315's age-based restrictions; Lone Starr Multi-Theatres, Ltd, *d/b/a* New Fine Arts West ("New Fine Arts"), an adult bookstore and adult video arcade subject to S.B. 315's age restriction; XTC Cabaret, Inc. ("XTC") and RCI Dining Services (Round Rock), Inc. ("Rick's Cabaret"), adult cabarets subject to S.B. 315's age restrictions which are owned by the same parent company. Appellants sued Ken Paxton, the Attorney General of Texas, and Ed Serna, the Executive Director of the Texas Workforce Commission, in their official capacities.

No. 24-50434

*C. Procedural History*

In June 2021, the TEA and other individual plaintiffs[3] filed a complaint under 42 U.S.C. § 1983, challenging the constitutionality of S.B. 315, seeking declaratory and injunctive relief. Four days later, they moved for a preliminary injunction. The district court held a hearing on that motion and ultimately denied it. In doing so, the district court determined that Texas enacted S.B. 315 with the reasonable belief that it would curb sex trafficking and sufficiently tailored the law to that end. In April 2022, Appellants filed their Amended Complaint adding the three other SOBs as plaintiffs to this case. The case then proceeded to discovery.

After discovery, the parties filed cross-motions for summary judgment. The motions were referred to a Magistrate Judge, who issued a Report and Recommendation on July 26, 2023. The Magistrate Judge recommended that Appellants' motion for summary judgment be denied, and that Texas's motion be granted in part, but only to hold that intermediate scrutiny should apply to Appellants' First Amendment claims. Both parties filed objections to the Report and Recommendation. In September 2023, the district court adopted the Magistrate Judge's Report and Recommendation, and the matter was set for a bench trial.

Before trial, the parties filed a joint stipulation of facts agreeing on the general operation of S.B. 315. The parties also admitted several pretrial exhibits, including S.B. 315's Legislative Record, the preliminary injunction hearing transcript, deposition excerpts of Appellants' corporate

_____

[3] This case initially included a few individual plaintiffs under age 21 who sought employment at SOBs. They all turned twenty-one before trial. The district court granted Texas's unopposed motion for those individuals to be dismissed from the case on the ground that their claims were moot. Appellants did not challenge that ruling below nor do they challenge it on appeal.

representatives, and deposition excerpts and evidence from the parties' witnesses. Three witnesses testified at trial. First, Appellants called Angelina Spencer-Crisp as an expert on human trafficking at SOBs. Spencer-Crisp wrote a paper on sex trafficking in Texas SOBs in response to the Texas Legislature's consideration of S.B. 315. She concluded that SOBs do not have high levels of sex trafficking, and that less than one percent of human trafficking in Texas occurs in SOBs.[4]

Second, Texas called Dr. Vanessa Bouche as an expert on human trafficking. She testified and provided an expert report asserting that S.B. 315 would reduce sex trafficking at SOBs. Her report shows that 24% of sex trafficking victims experienced trafficking at a strip club, while another survey that she conducted put the figure at 28%.[5] Dr. Bouche also identified age and psychological maturity as key factors in determining a person's susceptibility to trafficking and stated that, based on her research, the average age of entry into sex trafficking is 18–20 years old.

Third, Texas called Cara Pierce, a former federal sex-trafficking prosecutor. During her time as Assistant United States Attorney, Pierce

---

[4] In its findings of fact and conclusions of law, the district court noted that Spencer-Crisp's paper was never peer-reviewed or published and was only submitted to Appellants' counsel. It also found that Spencer-Crisp's conclusions (1) omitted calculations, (2) "relie[d] on inferences from studies that specifically disclaim the drawing of those same inferences," and (3) did not contain margins of error or confidence rates. Thus, the district court explained that it held significant doubts about the reliability of Spencer-Crisp's empirical research, and ultimately found that research much less credible than the testimony of Texas's witnesses. Appellants do not argue that the district court erred in doing so.

[5] Texas acknowledges that Dr. Bouche's surveys do not specify if the individuals surveyed were minors or adults when they were trafficked in a strip club—just that at some point in time, they were trafficked as minors and also trafficked at a strip club. Thus, it is possible that some portion of those surveyed were trafficked as minors, became adults, and were later trafficked in strip clubs as adults.

prosecuted many human trafficking cases, more than half of which involved SOBs. She testified that SOBs are hotspots for sex trafficking and noted that many of her trafficking investigations involved SOBs that were members of TEA. Pierce also noted that in her cases involving strip clubs, she had encountered two victims who did not start as dancers. One was a bartender who later became a dancer, and another was a waitress who later became a dancer.

After trial, the district court issued findings of fact and conclusions of law. The district court considered the extensive legislative history of S.B. 315, the evidence, and the parties' and witnesses' testimony. In doing so, the district court first concluded that intermediate scrutiny applied to Appellants' First Amendment challenge to S.B. 315. Then, the district court held that S.B. 315 furthers the State's interest in reducing sex trafficking and does not restrict substantially more speech than necessary to further that interest.

The district court acknowledged that S.B. 315 "plainly regulates more than necessary to stop sex trafficking." But it held that it does not regulate more *speech* than necessary. It concluded that non-dancer employees at SOBs, "such as janitors, parking valets, and security guards, have no demonstrated First Amendment expression intertwined with their jobs." Thus, the district court held that "while S.B. 315 sweeps broader than necessary, its sweep does not implicate the First Amendment expression of those non-performing workers." And to the extent that S.B. 315 restricts the expression of SOBs, the district court held that those effects were too marginal to constitute a substantial restriction on speech. The district court also held that S.B. 315 was not overbroad because while it "regulates broad swaths of employment at SOBs" it "is not chilling free expression by restricting the age of non-expressive positions." Appellants timely appealed.

## II.

Appellants invoked the district court's federal question jurisdiction because their claims arise under the First Amendment and 42 U.S.C. § 1983. *See* 28 U.S.C. § 1331. The district court entered final judgment on April 30, 2024. Thus, under 28 U.S.C. § 1291, we have appellate jurisdiction to review the district court's order.

On appeal from a bench trial, we apply a clear error standard to the court's findings of fact and a de novo standard for legal issues. *Hess Corp v. Schlumberger Tech. Corp.*, 26 F. 4th 229, 232–33 (5th Cir. 2022) (citation omitted). A district court's finding of fact is accorded great deference and is clearly erroneous only if it is "implausible in the light of the record considered as a whole." *Id.* (citing *Brumfield v. Cain*, 808 F.3d 1041, 1057 (5th Cir. 2015) (cleaned up)). "We employ a strong presumption that the court's findings must be sustained even though this court might have weighed the evidence differently." *Deloach Marine Servs., L.L.C., v. Marquette Transp. Co., L.L.C.*, 974 F.3d 601, 607 (5th Cir. 2020) (cleaned up). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985). And we grant "even greater deference to the trial court's findings when they are based on determinations of credibility." *Deloach*, 974 F.3d at 607 (cleaned up).

## III.

The sole issue on appeal is whether the district court erred by concluding that S.B. 315 withstands intermediate scrutiny and is not overbroad under the First Amendment. We hold that it did not.

*A. Level of Scrutiny*

The district court correctly concluded that intermediate scrutiny applies. We review First Amendment challenges to SOB regulations under the two-step test adopted in *City of Renton v. Playtime Theatres*, 475 U.S. 41 (1986). *See Ass'n of Club Execs of Dallas, Inc. v. City of Dallas*, 83 F.4th 958, 963 (5th Cir. 2023), *cert. denied*, 144 S. Ct. 1064 (2024). At the first step, we ask whether the law "ban[s]" SOBs or merely regulates the "time, place, and manner" of their operation. *See Renton*, 475 U.S. at 46. If the latter is true, the second step asks whether the law is "designed to combat the undesirable secondary effects of businesses that purvey sexually explicit materials rather than to restrict their free expression." *Club Execs.*, 83 F.4th at 963 (cleaned up). A regulation that satisfies both steps is reviewed under the standards applicable to content-neutral time, place, and manner regulations—namely, intermediate scrutiny. *Id.* Here, the district court concluded that S.B. 315 is not a ban, but rather regulates the time, place, and manner of SOBs and is designed to combat their undesirable secondary effects. This conclusion accords with *Renton*, and neither party challenges it on appeal. *See id.* Thus, intermediate scrutiny applies. *Id.*

*B. Intermediate Scrutiny*

The district court correctly concluded that S.B. 315 withstands intermediate scrutiny. Under *Renton*, we must uphold S.B. 315 "if it [1] 'is designed to serve a substantial governmental interest and [2] allows for reasonable alternative avenues of communication.'" *Id.* at 965 (quoting *Renton*, 475 U.S. at 50). S.B. 315 satisfies both *Renton* criterion.

*1. Substantial Governmental Interest*

An SOB regulation is "designed to serve a substantial government interest" when the municipality can "provid[e] evidence that supports a

link" between the regulated business and the targeted secondary effects. *Id.* at 965–66 (citing *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 433 (2002)). In *Renton*, the Supreme Court "specifically refused to set . . . a high bar" for municipalities attempting to establish this link. *See Alameda Books*, 535 U.S. at 438. Instead, it held that they may rely on evidence "reasonably believed to be relevant," but not on "shoddy data or reasoning" that does not "fairly support" the law's rationale. *Club Execs.*, 83 F.4th at 966 (cleaned up). In this context, evidence is "shoddy" if it does not support the law's rationale or if Appellants' evidence counters the municipality's findings.[6] *See id.* Critically, a government's evidentiary burden is light, and it need not "forge an ironclad connection between SOBs and secondary effects or to produce studies examining precisely the same conditions at issue." *Id.* at 967 (citing *Alameda Books*, 535 U.S. at 437). "[A]ll *Renton* demands is evidence 'reasonably believed to be relevant' to the problem." *Id.* (citing *Renton*, 475 U.S. at 51) .

S.B. 315 is "designed to serve a substantial government interest" because Texas can "provid[e] evidence that supports a link" between the regulated business and the targeted secondary effects. *Id.* at 965–66 (citing *Alameda Books, Inc.*, 535 U.S. at 433). Indeed, the record is replete with evidence linking SOBs to sex trafficking and sex crimes. Starting with strip clubs, the record includes: (1) expert testimony and a report from Dr. Bouche discussing how SOBs facilitate trafficking and how the average age of entry into "commercial sexual exploitation" is approximately 19 to 20 years old;

---

[6] We review a district court's findings as to the existence of a city's evidence for clear error, but we review de novo whether that evidence is "shoddy" or unreliable within the meaning of *Alameda Books*. *See H And & A Land Corp. v. City of Kennedale*, 480 F.3d 336, 338 (5th Cir. 2007).

(2) a study in S.B. 315's legislative record detailing how "[p]imps season women first with stripping and then turn them out into brothels or escort services"; (3) incidents of sex trafficking at TEA establishments and at a strip club owned by XTC and Rick's parent company; (4) Pierce's several prosecutions of human trafficking occurring at SOBs; (5) testimony from teenage performers establishing that strip clubs facilitate sexual assault, prostitution, underage drinking and illicit drug use; and (6) evidence that shows teenagers are more vulnerable to poor decision-making than adults due to their less developed brains. This evidence is sufficient to show a link between strip clubs and their undesirable secondary effects. *Id.*

Appellants have not demonstrated that Texas relied on "shoddy data or reasoning" that does not "fairly support" the law's rationale. *Club Execs.*, 83 F.4th at 966 (cleaned up). They assert that Texas did not produce evidence of males or nonperformers becoming victims of sex trafficking at adult nightclubs. But Texas provided evidence establishing that teenagers of both genders exercise poor judgment, and that strip clubs commonly feature rampant drug and underage alcohol use, prostitution, and sexual abuse. The *Renton* standard is reasonableness, and Appellants offer no evidence to counter the conclusion that young men working in such environments might normalize these behaviors and become participants or victims. *See Club Execs.*, 83 F.4th at 967. As to non-performers, the evidence includes a report from a former strip club manager detailing how strip clubs deliberately hire young women as waitresses and other non-performing positions to groom them into becoming dancers. And this evidence is consistent with Pierce's testimony recounting two victims who began as non-performers and later became dancers. Considering the evidence of trafficking and exploitation of performers, it is reasonable to view the employee-to-performer pipeline at SOBs as "relevant to the problem." *Id.* (cleaned up).

Appellants argue that Dr. Bouche's surveys—establishing that more than 24% of sex trafficking victims experienced trafficking at a strip club—are irrelevant because they only focused on minors. That is incorrect. Dr. Bouche's surveys do not specify if the individuals surveyed were minors or adults when they were trafficked in the strip club—just that at some point in time, they were trafficked as minors and also trafficked at strip clubs. In other words, it is possible that some portion of those surveyed were trafficked as minors, became adults, and were later trafficked in strip clubs as adults. Others may have been minors when they were trafficked. Regardless of whether they were minors when they were trafficked, the survey is nonetheless relevant because one governmental interest that justifies S.B. 315 is to prevent minors who can pass for eighteen but not twenty-one from working at SOBs.[7]

To be sure, Texas's argument regarding other SOBs, like adult bookstores and arcades, is less clear cut. Appellants argue that Texas did not produce evidence of employees being trafficked at an adult bookstore, video store, or arcade. They are right. Instead, for this subset of SOBs, Texas provided a few studies that show a link between these establishments and sex crimes and testimony about how private rooms in these establishments serve as hotbeds for trafficking and prostitution. Appellants are correct that Texas could have produced more precise evidence on this point. Recall, however, that Texas's evidentiary hurdle is low, and it need not "forge an ironclad

---

[7] Given Texas's light evidentiary burden under *Renton*, Appellants' arguments regarding the exact number of trafficking cases produced by Pierce and Dr. Bouche are meritless. Appellants appear to be in search of the sort of "ironclad connection" between SOBs and secondary effects that our precedents explicitly reject as unnecessary. *See Club Execs.*, 83 F.4th at 967. And, as discussed, the district court found Spencer-Crisp—Appellants' only testifying expert—much less credible than Texas's witnesses.

connection between SOBs and secondary effects or to produce studies examining precisely the same conditions at issue." *Club Execs.*, 83 F.4th at 967 (citing *Alameda Books*, 535 U.S. at 437). Indeed, in *Renton*, the Court "specifically refused to set . . . a high bar" for municipalities in establishing the link between a regulation on SOBs and a government interest. *Alameda Books*, 535 U.S. at 438. Here, the district court is correct that Texas provided "evidence 'reasonably believed to be relevant' to the problem," which is "all *Renton* demands." *Club Execs.*, 83 F.4th at 967 (citing *Renton*, 475 U.S. at 51).

### 2. Substantial Governmental Interest

Pressing forward, S.B. 315 satisfies the second prong of *Renton* because it "allows for reasonable alternative avenues of communication." *See id.* at 965 (citing *Renton*, 475 U.S. at 50). Instead of examining S.B. 315 under *Renton*, the district court assessed whether S.B. 315 restricted substantially more speech than necessary under *United States v. O'Brien*.[8] *See* 391 U.S. 367, 377 (1968). In other words, it examined whether S.B. 315 was narrowly tailored. Nonetheless, we have acknowledged that the *Renton* test "embod[ies] much the same standards" as those set forth in *O'Brien*. *Barnes*,

---

[8] While *Renton* provides the test for evaluating time, place, and manner regulations aimed at the secondary effects of SOBs, we typically evaluate general conduct regulations that incidentally restrict speech using the four-factor test in *O'Brien*, 391 U.S. at 377. Under *O'Brien*, a government regulation is justified if it is:

> [1] within the constitutional power of the Government; [2] if it furthers an important or substantial governmental interest; [3] if the governmental interest is unrelated to the suppression of free expression; and [4] if the incidental restriction on alleged First Amendment freedoms is no greater than essential to the furtherance of that interest.

*O'Brien*, 391 U.S. at 377.

501 U.S. at 566. Thus, "a restriction that satisfies *Renton*'s formulation is necessarily narrowly tailored."[9] *Club Execs.*, 83 F.4th at 965 n.8 (cleaned up).

S.B. 315 allows for reasonable alternative avenues of communication because it leaves SOBs' "quantity and accessibility of [] speech substantially undiminished." *Id.* (citing *Alameda Books*, 535 U.S. at 445 (Kennedy, J., concurring in the judgment)). To start, Appellants have not established that their expressive conduct of their establishments is contingent on the age of their employees. Indeed, Appellants' expert, Spencer-Crisp testified that the ability to hire "18-year-old girls to take their clothes off" is "not important to the business model" of a strip club, and later agreed that the "age of the dancer is not important to the sexual expression of the dancer." Moreover, Appellants do not argue that they advertise the age of their dancers or employees, that their customers request dancers or employees of a particular age, or that the age of their employees is relevant in any way to their speech.

Appellants instead argue that "bookstore/arcade employees are, in fact, directly involved in disseminating constitutionally protected speech" and "non-performing personnel in adult nightclubs play essential roles in the production and presentation to the audience of the constitutionally protected erotic dance performances." They press that "[w]ithout them the show could not go on." But this argument misses the point. Our inquiry is not whether Appellants' employees play a part in the dissemination of their speech but rather whether S.B. 315's restriction on the age of their employees leaves open reasonable alternative avenues of communication for Appellants' protected speech. *See Club Execs.*, 83 F.4th at 969. Appellants failed to establish how S.B. 315's restriction on the age of their employees

_____

[9] Neither party suggests that the district court erred in using the *O'Brien* test in its intermediate scrutiny analysis or that the more precise *Renton* test would have produced a different outcome.

meaningfully restricts their expression. To be sure, the statute restricts their ability to hire employees of a certain age which could cost SOBs money and some inconvenience. But "[a] regulation need not be costless to be valid." *Id.* (citing *Lakeland Lounge of Jackson, Inc. v. City of Jackson*, 973 F.2d 1255, 1260 (5th Cir. 1992)). Instead, it must merely leave SOBs with a "reasonable opportunity to open and operate" their businesses. *Club Execs.*, 83 F.4th at 967 (citing *Renton*, 475 U.S. at 54). Appellants have not established that S.B. 315 precludes their ability to open and operate or otherwise substantially restricts their ability to disseminate speech. *See id.*

Setting aside their own expression, Appellants briefly argue that S.B. 315 restricts the expression of individual employees under the age of twenty-one. They press that the district court erred in concluding that none of the employees of SOBs, other than dancers, have "any demonstrated expression intertwined with their jobs" and thus, their employment does not implicate the First Amendment. As a preliminary matter, there are no employees before this court because the only employees that were originally in this case turned twenty-one before trial and were dismissed from the suit. The district court granted Texas's unopposed motion for those individuals to be dismissed from the case on the ground that their claims were moot, and Appellants did not challenge that ruling below or in this appeal. Even so, S.B. 315 likely also permits reasonable avenues of communication for employees of SOBs. S.B. 315 merely restricts their ability to work with certain types of businesses. Appellants do not contest that S.B. 315 leaves those individual employees free to engage in nude dancing or distribute the sort of adult materials found in adult bookstores and arcades outside of SOBs, even for profit.

In sum, S.B. 315 satisfies the second prong of *Renton* because "it leave[s] the quantity and accessibility of the speech" of SOBs and their employees "substantially undiminished." *Id.* (citing *Alameda Books*, 535 U.S.

at 445 (Kennedy, J., concurring in the judgment)). Thus, S.B. 315 "allows for reasonable alternative avenues of communication," and the district court correctly concluded that it withstands intermediate scrutiny. *See id.* at 969 (citing *Renton*, 475 U.S. at 50).

### C. Overbreadth

The district court likewise correctly concluded S.B. 315 is not overbroad.[10] "The overbreadth doctrine prohibits the Government from banning unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002). It "enables litigants to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Hill v. Colorado*, 530 U.S. 703, 732 (2000) (cleaned up). The doctrine "is strong medicine" and should be employed "only as a last resort." *L.A. Police Dep't v. United Reporting Pub. Corp.*, 528 U.S. 32, 39 (1999) (internal quotation marks and citation omitted).

Appellants remind us that the district court determined that "S.B. 315 plainly regulates more than necessary to stop sex trafficking, as it prohibits all employment of 18- to 20-year-olds at SOBs." But overbreadth is not about whether a statute generally regulates more than it needs to. Instead, the doctrine's purpose is to "protect the expressive rights of third parties who are not before the court." *Doe I v. Landry*, 909 F.3d 99, 109 (citing *United*

---

[10] As explained, S.B. 315 satisfies the *Renton* test which "embod[ies] much the same standards" as those set forth in *O'Brien*. *Barnes*, 501 U.S. at 566. And although overbreadth is doctrinally separate from *O'Brien*, "satisfying *O'Brien*, when that is the appropriate test, will usually obviate the need" to analyze overbreadth. *Doe*, 909 F.3d at 111.

*States v. Hicks*, 980 F.2d 963, 969 (5th Cir. 1992) (emphasis omitted)). In other words, overbreadth is concerned with speech. *See Ashcroft*, 535 U.S. at 255. Appellants raise concerns about the scope of S.B. 315, but they fail to ground those concerns in any unduly chilled protected speech. And while Appellants are correct that S.B. 315 regulates the conduct and operation of SOBs, the function of the overbreadth doctrine "attenuates" as the regulated expression moves from "pure speech toward conduct." *See L.A. Police Dep't*, 528 U.S. at 40 (cleaned up). In short, Appellants failed to demonstrate the applicability of our sparingly invoked overbreadth doctrine. *See id.* at 39.

\* \* \*

In sum, Texas has established a reasonable belief that S.B. 315 furthers a substantial state interest and that it permits reasonable alternative avenues of communication. Appellants have failed to establish that S.B. 315 prohibits or chills a substantial amount of protected speech. Thus, the district court did not err in holding that S.B. 315 is constitutional under the First Amendment.

**IV.**

For the foregoing reasons, we AFFIRM the district court's judgment in full.